IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE HENRY B. WILSON, JR., REVOCABLE TRUST

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE HENRY B. WILSON, JR., REVOCABLE TRUST DATED JUNE 27, 2002.

LOU ANN GODING, APPELLANT,

v.

ROGER A. WILSON AND ROSEANN M. WILSON, COTRUSTEES OF THE HENRY B. WILSON, JR.,
REVOCABLE TRUST DATED JUNE 27, 2002, APPELLEES.

IN RE ESTATE OF HENRY B. WILSON, JR., DECEASED.

LOU ANN GODING, APPELLANT,

v.

ROGER A. WILSON AND ROSEANN M. WILSON, COPERSONAL REPRESENTATIVES
OF THE ESTATE OF HENRY B. WILSON, JR., DECEASED, APPELLEES.

Filed November 21, 2017.    Nos. A-15-1014, A-15-1015.

Appeals from the County Court for Sherman County: TAMI K. SCHENDT, Judge. Judgment in No. A-15-1014 affirmed as modified. Judgment in No. A-15-1015 affirmed.

Nicole K. Seckman Jilek, Jeffrey J. Blumel, and Thomas J. Malicki, of Abrahams, Kaslow & Cassman, L.L.P., for appellant.

Larry W. Beucke, of Parker, Grossart, Bahensky, Beucke, Bowman & Symington, L.L.P., for appellees.

- 1 -

MOORE, Chief Judge, and RIEDMANN and BISHOP, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Lou Ann Goding (Lou Ann) appeals from orders entered by the county court for Sherman County in two consolidated cases; one concerns the administration of her father's trust, and the other her father's estate. Lou Ann succeeded in removing her two siblings as cotrustees of their father's trust and obtaining a surcharge against them for $73,675.88. An accounting was ordered for the trust and Lou Ann was awarded $20,000 for attorney fees. Lou Ann did not obtain the relief she requested in the estate case. Lou Ann appeals from the orders entered in both cases. We affirm the trust case as modified, and affirm the estate case.

## II. FACTUAL BACKGROUND

Henry B. Wilson, Jr. (Henry) passed away on December 23, 2010. His wife, Eleanor Wilson (Eleanor), predeceased him, but he was survived by three children: Lou Ann, Roger A. Wilson (Roger), and Roseann M. Wilson (Roseann). Lou Ann resides and works in Omaha, Nebraska. She received a certified public accountant's certification shortly after graduating from college, and subsequently became a consultant for a large family business. Lou Ann is also an elected official and was appointed to serve as a trustee for an employee retirement fund. Roger lives in Tucson, Arizona, and is an active duty member of the military. His military service has taken him overseas a number of times, including a tour in Afghanistan from May 2012 through August 2013. Roseann lives in Loup City, Nebraska, and is a self-employed farmer and rancher. After attending the University of Nebraska School of Technical Agriculture, Roseann "came back home to help dad and mom on the farm and ranch" in 1988. She was initially treated as an employee, but she subsequently started getting her own cattle and buying her own land. She continued to operate the farm and ranch with Henry, but "[i]t was pretty much whatever dad wanted." Roseann and Henry commingled their operations in various ways, for example, they would sometimes feed Roseann's corn to Henry's cattle and vice versa, or Henry would pay some bills and tell Roseann to pay others regardless of ownership.

In 2002, Henry and Eleanor created revocable trusts: the "Henry B. Wilson, Jr. Revocable Trust Dated June 27, 2002" (Henry's Trust), and the "Eleanor M. Wilson Revocable Trust Dated June 27, 2002" (Eleanor's Trust). Henry and Eleanor transferred all of their real property to themselves in their capacity as trustees of their respective trusts as equal tenants in common. Both Henry's Trust and Eleanor's Trust had an assignment schedule which transferred "[a]ll my interest in personal household furniture and furnishings, wearing apparel, collectibles and antiques, personal effects and other articles, tools, and equipment or personal or household or yard use or ornament which I presently own or may hereafter acquire" to their respective trusts.

Henry became trustee of Eleanor's trust upon her death in March 2008. Eleanor's Trust provided that if Henry survived her, he would become trustee of her trust and would distribute a fractional share of the trust property to his trust (for tax purposes), and any of Eleanor's Trust assets not transferred to Henry's Trust were to be administered as Trust "A." Trust "A" was to pay income to Henry and to support Henry during the remainder of his life. Henry subsequently

transferred all interests in land held by Eleanor's trust to himself in his capacity as the trustee of Trust "A."

Henry's Trust, Eleanor's Trust, and Trust "A," provided that, upon the death of the last surviving spouse, real property interests within each trust be distributed directly to three separate and unequal subtrusts in the name of each of their children: the Lou Ann Goding Trust, the Roger Wilson Trust, and the Roseann Wilson Trust. Henry's Trust and Eleanor's Trust also provided for the distribution of the residue of their respective trusts in equal shares to their three children.

The three separate and unequal subtrusts created by Henry's Trust and Eleanor's Trust had identical language regarding trust management. In relevant part, the instructions for the Lou Ann Goding Trust directed the trustee of the subtrust, "[u]ntil the death of my said daughter, LOU ANN GODING, the trustee shall pay the net income from the trust in convenient installments (at least annually) to my said son [sic] so long as my said son [sic] shall live."

When Henry died, the terms of Henry's Trust, as amended, appointed Roseann and Roger as the cotrustees of Henry's Trust. Although Roseann and Roger were cotrustees, Roseann was the primary actor in gathering assets and managing the Trust after Henry's death. Roseann kept Roger informed of her actions by phone and email. The Trust owned approximately 4,200 acres of land.

Pursuant to Henry's Trust, the cotrustees transferred real estate from Henry's Trust and from Eleanor's Trust "A" to the subtrusts on December 30, 2011.

In addition to his Trust, Henry drafted a will and devised all of his personal and household effects to his Trust. Article Fourth of Henry's will disposed of the estate residue, stating: "[a]ll the residue of my estate I devise to the trustee of the Trust to be added to the Trust and administered as a part of and pursuant to all terms and conditions thereof." The will nominated Roseann and Roger as copersonal representatives of Henry's estate upon his death.

The attorney who prepared Henry's estate plan drafted Henry's will and Henry's Trust. The attorney explained the pour-over will was like "a backup document that in case you didn't get all the assets into the trust or identified with the trust at time of death, it would . . . pour those assets into the trust to be distributed under the terms of the trust." The result was to send everything to the trust. On January 14, 2011, the attorney sent a letter to the cotrustees of Henry's Trust and Eleanor's Trust "A," indicating he had been hired on their behalf to settle Henry's Trust and estate, "and Eleanor's." The letter explained how the trust worked and under what circumstances an estate proceeding might be necessary. The goal was to avoid probate, but the attorney explained in Henry's case, some assets were discovered which were not identified with the trust or did not have a beneficiary or were not payable on death to the trust. And since the trust was the beneficiary of the will, "we did have to file the will and start a probate in order to get those assets from the financial institution into the trust." An estate inventory was filed on December 28, 2011, and the inheritance tax worksheet and receipt were all signed "right at the end of December." According to the attorney, the estate was ready to close at that point, but it had not been closed because of the pending litigation.

Lou Ann filed her first petition regarding Henry's estate in February 2013, and her first petition regarding Henry's Trust in December.

## III. PROCEDURAL BACKGROUND

This appeal involves two consolidated cases. Case No. A-15-1014 (PR 13-13) (the trust case) concerns Henry's Trust and the cotrustees' actions related to that trust. Case No. A-15-1015 (PR 11-17) (the estate case) concerns the copersonal representatives' actions as related to the estate. As noted previously, Roseann and Roger were appointed as cotrustees for Henry's Trust and as copersonal representatives for Henry's estate. The cases were consolidated for trial, which took place on June 30 and July 1, 2015. The county court issued its final orders for both cases on October 1.

In the trust case, the county court concluded Roseann and Roger breached their fiduciary duties as cotrustees of Henry's Trust under Neb. Rev. Stat. § 30-3875 (Reissue 2016) by: failing to keep accurate records, commingling assets, and not keeping the cotrustees' property separate from Trust property. The county court found the cotrustees breached their fiduciary duties under Neb. Rev. Stat. § 30-3878 (Reissue 2016) by failing to keep beneficiaries of the trust reasonably informed about the administration of the trust and of the material facts necessary for them to protect their interests. Finally, the county court determined the cotrustees breached their fiduciary duties by: paying personal expenses out of Trust assets, failing to maintain the subtrusts created by the Trust as separate trusts, and failing to pay the income from the Trust to Lou Ann.

The county court found the breaches all qualified as serious breaches under Neb. Rev. Stat. § 30-3862 (Reissue 2016) and that it was in the best interests of the trust administration to remove Roseann and Roger as cotrustees of Henry's Trust. The county court removed the cotrustees (except for their duty to provide an accounting), ordered an accounting, surcharged the cotrustees $73,675.88 for payments made from Trust assets for personal expenses and expenses that were not the responsibility of the Trust, and awarded attorney's fees in the amount of $20,000 in favor of Lou Ann and against the cotrustees, jointly and severally.

In the estate case, the court found that, pursuant to the terms of Henry's will, any residue of Henry's estate poured over into the Trust, and the Trust was the only beneficiary of the estate. The court found that all of Lou Ann's claims for unaccounted property and for damages were claims for the Trust administration and not the estate proceeding. Accordingly, the county court dismissed Lou Ann's petition for: termination and removal of the copersonal representatives, appointment of a successor personal representative, an accounting, and a surcharge. The court also overruled Lou Ann's objection to the inventory. The county court ordered the copersonal representatives to file a final accounting, a schedule of distribution, and a formal petition for complete settlement of the estate within 30 days.

## IV. ASSIGNMENTS OF ERROR

Lou Ann assigns 14 errors to the county court, which we consolidate and restate as follows: as to the Trust case, (1) failing to surcharge Roseann and Roger for various amounts paid from the Trust; (2) making a mathematical error in the total surcharge amount ordered; (3) failing to remove Roseann and Roger as cotrustees of her subtrust; (4) failing to award amounts due to Lou Ann under the Trust; (5) excluding certain testimony and exhibits; (6) making an insufficient award of attorney fees and costs; (7) ordering Trust beneficiaries to pay the successor trustee's fee if there are insufficient assets in the Trust; and as to the estate case, (8) failing to remove Roseann and

Roger as copersonal representatives of the estate, not assessing a surcharge, and overruling Lou Ann's objection to the estate's inventory.

## V. STANDARD OF REVIEW

Both probate and trust administration matters are reviewed for error appearing on the record, absent an equity question. *In re Estate of Robb*, 21 Neb. App. 429, 839 N.W.2d 368 (2013). When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *In re Estate of Muncillo*, 280 Neb. 669, 789 N.W.2d 37 (2010).

Where an equity question is presented, both probate or trust administration matters are reviewed de novo. *In re Estate of Robb*, *supra*.

The removal of a trustee is a question of equity, and therefore an appellate court reviews de novo the question of whether a trustee was properly removed. *Id*.

The removal of a personal representative is not an equity question, and the removal is reviewed for error appearing on the record. *Id*.

A trial court has the discretion to determine the relevancy and admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of discretion. *Gallner v. Larson*, 291 Neb. 205, 865 N.W.2d 95 (2015).

A trial court's decision awarding or denying attorney fees will be upheld on appeal absent an abuse of discretion. *In re Conservatorship of Abbott*, 295 Neb. 510, 890 N.W.2d 469 (2017).

## VI. ANALYSIS

We will first address matters Lou Ann has raised related to the administration of Henry's Trust, followed by her assigned errors related to the administration of Henry's estate. In considering Lou Ann's alleged errors related to the Trust, we bear in mind the following legal principles related to trust administration.

A trustee shall keep adequate records of the administration of the trust and shall keep trust property separate from the trustee's own property. See § 30-3875. Further, a trustee shall keep the qualified beneficiaries of the trust reasonably informed about the administration of the trust and of the material facts necessary for them to protect their interests, and unless unreasonable under the circumstances, a trustee shall promptly respond to a beneficiary's request for information related to the administration of the trust. See § 30-3878.

A trustee's actions are presumed proper and the burden rests on a plaintiff to prove a breach of trust. See *In re Rolf H. Brennemann Testamentary Trust*, 288 Neb. 389, 849 N.W.2d 458 (2014). A trustee's violation of a duty owed to a beneficiary is a breach of trust, and among other things, the court may: compel the trustee to pay money or restore property, order the trustee to account, or remove the trustee. See Neb. Rev. Stat. § 30-3890 (Reissue 2016). The court may remove a trustee if the trustee has committed a serious breach of trust, among other reasons. See § 30-3862.

The county court found the cotrustees breached their fiduciary duties by: commingling assets and not keeping cotrustees' property and expenses separate from the Trust's property and expenses; failing to keep accurate records; failing to keep Lou Ann reasonably informed regarding the administration of the Trust; paying personal expenses out of Trust assets; failing to maintain the subtrusts as separate trusts; and failing to pay income from the Trust to Lou Ann. Further, the

court found the breaches of fiduciary duties to be serious breaches of trust, and it was in the best interest of the Trust administration to remove the cotrustees. The court appointed an attorney as a successor trustee. The court also determined some of the transactions challenged by Lou Ann were made by Henry prior to his death, and there was no allegation or evidence he was unable to handle his own affairs. The court itemized payments made from Henry's Trust which were for personal expenses and therefore not the responsibility of the Trust. The cotrustees were ordered to pay $73,675.88 within 30 days to restore the Trust to where it would have been had the cotrustees not breached their duties. The court ordered an accounting and awarded Lou Ann attorney's fees. Additionally, the court specifically stated, "Any other claim for relief not specifically addressed in this order is denied."

We now address Lou Ann's assigned errors related to the trust. Notably, most of Lou Ann's arguments challenge factual determinations made by the county court. In our review of the contested evidence, we bear in mind that when the evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the circumstances that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. See *Torres v. Morales*, 287 Neb. 587, 843 N.W.2d 805 (2014).

### 1. SURCHARGE AMOUNTS

Lou Ann acknowledges the trial court found several payments made by the cotrustees were for personal expenses and they were ordered to repay certain amounts to the Trust. She claims, however, there were additional expenses which should have been restored to Henry's Trust. On the other hand, the cotrustees assert that although they "disagree with the trial court's decision that they committed a serious breach of trust, they do not appeal the decision." Brief for appellee at 11. Further, while they disagree with some of the surcharges assessed against them, they accept the court's decision. We discuss each claim raised by Lou Ann in turn.

### (a) Farmers Mutual Farm-Guard Insurance Policy

The county court surcharged the cotrustees $767.67 related to the Farmers Mutual Farm-Guard insurance policy for coverage from March 1, 2011, to March 1, 2012. The cost for the one-year policy was $4,606. Roseann justified this as a Trust expense because the insured land was still in the Trust's name, they were in the administration period, farming operations were continuing, and "it's not a smart thing to leave land uninsured." The county court arrived at $767.67 for "coverage of the property after it was transferred to the sub trusts." Since the transfer to the subtrusts took place on December 30, 2011, the January and February 2012 share of the one-year policy cost would equal the $767.67 assessed against the cotrustees. Lou Ann argues the county court should have surcharged the entire $4,606 because the policy covers liability related to farming operations and she was not aware of the Trust conducting any farming operations at that time.

By surcharging Roseann only for the two months after the land in question was transferred from Henry's Trust to the subtrusts, the county court was apparently persuaded by Roseann's testimony about the need for insurance to cover the farming operations on the property rather than Lou Ann's testimony to the contrary. The county court's decision is reasonable and is supported by competent evidence.

### (b) Electricity Expenses

The county court ordered the cotrustees to restore $1,700 to the Trust for payments made to Loup Valley Rural Public Power and Custer Public Power for "electrical power to the house and feed yard." Lou Ann contends this amount is not sufficient. She says the evidence shows the cotrustees used Trust funds "to pay over $4,549.39 in electricity expenses" and "only benefited the user of the properties, Roseann[.]" Brief for appellant at 19-20.

At trial, Lou Ann called William Kenedy, a certified public accountant, as an expert witness. Kenedy produced a form, exhibit 117, which summarized all of the disputed transactions from the Trust. The exhibit and Kenedy's testimony reflect the disputed amount for electricity payments to be $1,700. The exhibit also reflects credits for reimbursements made by Roseann. Roseann explained there were 30 meters on different farms, and her father always took care of the meters and electrical. It took Roseann a while "to figure out which meter went to what place," so she paid the electricity out of the Trust and then "later sorted it out and went back and paid back the ones that would have been [her] expense." The court surcharged the entire amount still in dispute as reflected in the exhibit prepared by Lou Ann's expert, Kenedy. We find no error in the county court's determination.

### (c) Farmers Coop Propane

The county court did not surcharge the cotrustees for any propane payments and did not discuss the payments in its order. As stated in the county court's order, any claim for relief not specifically addressed in the order was denied. Lou Ann contends the cotrustees used Trust funds to pay $2,370 in propane charges to Farmers Coop. Lou Ann testified the payments to Farmers Coop reflected in exhibits 53 and 54 (the last charges were incurred in March 2011) "related to propane post my father's death, that my sister has handwritten a note that says dad's house. But I know she's also told me that she had a hard time figuring out meters and wasn't quite sure how it all related." Roseann acknowledged that her father's house became part of her trust (the Roseann Wilson Trust) and stated that she paid the propane bills out of Henry's Trust because she thought she was required to maintain the property as trustee. She did not think it would have been smart to shut the propane off and "let the pipes freeze and everything in the house." Roseann said her sister came to get things out of the house and stayed once or twice, and other relatives were coming to see the family and stayed at the house. Roseann and her nephew would stay at the house a "couple days a week" because she did not want people to think the house was empty. She said "[t]here was still a lot of property to protect."

Roseann's explanation for these propane charges for Henry's house for the few months following his death were reasonable, and cannot be said to have only benefitted Roseann in light of the family coming and going in those few months after his death. There was no error in the county court's decision to not assess the propane charges against the cotrustees.

### (d) 2011 Personal Property Tax

The trial court did not discuss nor surcharge the cotrustees for a disputed 2011 property tax payment in the amount of $2,777 made from Henry's Trust in April 2012. Lou Ann argues Roseann should not have used Trust funds to pay the 2011 personal property tax because: the Trust did not own the property in question; the payment was financially harmful to Lou Ann; and the

payment only benefitted Roseann. The evidence supports Lou Ann's position, and Roseann's limited testimony on this issue fails to sufficiently justify attributing this tax obligation to Henry's Trust.

Kenedy testified that exhibit 57 (Nebraska Personal Property Return for tax year 2011; required to be filed with the assessor on or before May 1 of the tax year) indicated that Henry's Trust owned various farm equipment with an assessed value of $165,906 for the 2011 tax year. He further testified he had reviewed the Trust's income tax return for the 2011 tax year, and that if the machinery and equipment were owned by the trust in 2011, he would expect to see depreciation as an expense on the return. Kenedy testified there was no depreciation shown on the Trust's income tax return. The tax receipt for "Roll Year 2011" (exhibit 59) shows "Tax Due 12/31/2011" on a value of $165,906 in personal property to be $2,777.38. The first half of the tax was due May 1, 2012, and the second half was due September 1, 2012. However, "FULL" payment was shown as being made on April 30, 2012.

In her brief, Roseann responds that she paid the personal property tax with Trust funds because she believed the personal property in question was still owned by the Trust. At trial, when asked why she paid tax from the trust account, she answered:

When I went in to file the personal property [sic] I came up here to the courthouse and went to the assessor and she told me - she said it was who owned the property on January 1st. Well, my dad had died on December 23rd, we'd had the funeral on December 28th, and I'm not even sure by January 1st that Roger and I had even met with the attorney yet.

So I assumed that it was - nothing had been distributed yet, that the machinery was still my dad's - or his on January 1st. And the assessor told me if that was the case, she said that you need to file that in your dad's name and that his trust needs to pay that property tax.

Roseann then confirmed the machinery listed on the second page of exhibit 57 were "items that eventually went" to her. That was the full extent of her testimony related to the 2011 personal property tax.

The description of personal property on the second page of exhibit 57 reflects a total value of $165,906, which is consistent with the tax receipt for "Roll Year 2011" showing $2,777.38 to be the "Tax Due 12/31/2011" on a value of $165,906 in personal property. The personal property identified includes various farm equipment or machinery, such as tractors, loaders, a stack mover, dozer, 4-wheeler, and pivot. Consistent with Roseann's recollection of the assessor's "January 1st" comment, we note that at the bottom of the first page of exhibit 57, it states: "WHO MUST FILE. If you hold or own any taxable tangible personal property on January 1 at 12:01 a.m. of the year for which the assessment is being made, you must file a Nebraska Personal Property Tax Return." Roseann signed the "Nebraska Personal Property Return" as trustee of Henry's Trust on April 28, 2011. Roseann's submission of the document to the assessor in April 2011 identified the property subject to taxation for the 2011 tax year; with the first half of the taxes due May 1, 2012, and the second half due August 1, 2012. The property tax form identifies the taxable personal property in existence as of January 1, 2011, but the issue is whether Henry's Trust or Roseann should be

responsible for paying the taxes associated with that property for the 2011 tax year; in other words, who held or owned the property as of January 1.

Notably, upon Henry's death on December 23, 2010, and according to the Trust, the items listed in exhibit 57 were to be distributed to Roseann. The owner of personal property within the meaning of the tax laws is the person who has the legal title thereto. *Landis Machine Co. v. Omaha Merchants Transfer Co.*, 142 Neb. 397, 9 N.W.2d 198 (1943) (holding that under a conditional sales contract, the personal property belonged to the vendee, along with the personal property taxes incident to that ownership, in light of the vendee's use and enjoyment as the general beneficial owner, whereas the interest of the vendor was one of title for security of payment only and not absolute ownership). If the owner of personal property within the meaning of the tax laws is the one with legal rights to that property, then Henry's Trust would not have had any further legal right or title to the personal property as of January 1, 2011. Roseann's legal right to ownership of the personal property, and her right to the use and enjoyment of the same, would have been immediate upon Henry's death. Additionally, Roseann farmed with her father and would have had immediate access to the personal property he left for her. Roseann's vague testimony that the property "eventually went" to her does not change her immediate right of ownership. There was no official act required by Roseann and Roger, as cotrustees, to effectuate Roseann's legal right of ownership to and possession of that personal property.

The dissent argues the evidence did not support a finding that Roseann "owned or held" the personal property in question as of January 1, 2011, apparently because Roseann testified that as of that date, "nothing had been distributed yet." The dissent focuses on when the actual physical distribution of the personal property (equipment or machinery, such as tractors, loaders, a stack mover, dozer, 4-wheeler, and pivot) might take place rather than when legal title or right to that property passed. Contrary to the dissent's assertion, the above reference to *Landis Machine Co. v. Omaha Merchants Transfer Co.*, *supra*, is not to "liken[] [this] situation to that of [the] conditional sales contract" in that case. Rather, the case is cited solely for the legal proposition that the owner of personal property within the meaning of the tax laws is the person who has the legal title thereto. Roseann had that right upon Henry's death, and as cotrustee of Henry's estate, she should not be permitted to impose tax liabilities upon Henry's Trust for personal property she has inherited simply by saying she had not "distributed" that property to herself yet. This is especially problematic given the commingling of assets between Henry and Roseann prior to Henry's death as discussed in more detail later. Even the court stated, "The lack of accurate record keeping and commingling of assets makes it difficult to determine the amount of damages that have occurred due to the [cotrustees] breaches of their duties."

We conclude the exhibits and testimony support the personal property tax being owed by Roseann rather than Henry's Trust, and there is no competent evidence to the contrary. The court erred in failing to include this tax in the surcharges assessed against the cotrustees, therefore, we modify the court's order to include a surcharge of $2,777 for the 2011 personal property tax.

(e) Bathroom Remodel

The county court ordered $841.30 restored to the Trust for "work done on remodeling the bathroom in [Henry's] house." This amount correlates to an invoice from Bochart Heating, Cooling & Electric, Inc. (exhibit 60) for that exact amount. Roseann testified this was for electrical

work associated with the finishing of the bathroom. Roseann paid the electrical expenses from the trust because "it was dad's agreement to go ahead and put it in and it was already started before he died."

Lou Ann argues that an additional $1,315 should be surcharged for Trust funds used to pay Ron Shelton for his work on the bathroom remodel. The court's order was silent as to this payment. Lou Ann argues she did not receive any benefit from the remodel, and the only beneficiaries of this payment were Roseann and one of Roger's sons. Lou Ann testified her sister benefitted because the house was part of her trust, and her brother's son lived in the house part of the time.

Roseann claimed the bathroom remodeling payments were part of a project that began in 2010, after Henry became ill. She said the bathroom remodeling project was designed to help Henry bathe easier by building a shower he could "roll a wheelchair into" or that had rails. Roseann said Henry agreed that "would be nice." After his last surgery in October or November, they bought the tile, "the plumbing stuff," and the carpenter was hired and "he started on this bathroom and had half of it built when dad died." Roseann did not explain the payment to Ron Shelton at trial, but her brief on appeal states, "The Ron Shelton check, Exhibit 62, was not explained, but ostensibly it was for completion of the bathroom as well." Brief for appellee at 14. Lou Ann testified it was her understanding the payment to Ron Shelton was for part of the bathroom remodel.

We cannot say it was error for the county court to order some costs reimbursed to the Trust while also excluding other costs associated with the bathroom remodel. There was evidence at least some of the costs were incurred with Henry's consent before he died. The court's decision to split the costs as only partially attributable to the Trust was a reasonable compromise on this disputed claim.

(f) North Country Windows

Trust funds were used to pay $2,780 to North Country Windows for windows installed at "Grandma's House." This property was owned 50-percent by Roseann outright, 25-percent by the three siblings outright, and 25-percent by the three subtrusts. As a result, Roseann had an outright interest of 7/12, each sibling had an outright interest of 1/12, and each subtrust had a 1/12 interest in this property. Prior to Henry's death, Roseann and Henry each owned a 50-percent interest in this property. According to Roseann, Henry "took the rent off the house and he had me farm the ground," which Roseann share cropped.

Lou Ann contends that since the Trust only had a 25-percent ownership interest in the house, the other 75-percent ($2,085) of the total amount paid ($2,780) for the windows is owed by the siblings in their respective percentages of outright interest in the property. The county court did not discuss nor surcharge the cotrustees for the windows.

Roseann explained that "we had been putting new doors - new windows on the house," and Roseann put "the first windows on the house and it was dad's agreement with me that he would finish and put the last windows on." Roseann said the windows she put on the house totaled $11,000 and her father "never paid any of that." According to Roseann, "he agreed that he would finish the rest of the windows. So that was our agreement well before he died." Roseann acknowledged this was done by verbal agreement and that Henry "didn't put that kind of stuff in his trust agreement."

While Lou Ann's position with regard to how the window costs should have been apportioned between the Trust and the siblings individually is reasonable given the various ownership interests in the property, we cannot say the county court erred in declining to order the restoration of $2,085 to the Trust. Roseann's testimony that she paid $11,000 for the "first windows on the house" and that Henry agreed to cover the remaining costs supports the county court's decision to allow the Trust to cover the entire remaining costs for the windows.

### (g) Summary of Surcharges

In summary, aside from the personal property tax claim, there was competent evidence to support the county court's decision to assess or not assess the challenged amounts discussed above. As to the personal property tax claim, we modify the surcharge total to include an additional $2,777.

### 2. SUM OF ITEMIZED PAYMENTS

Lou Ann assigns, but does not argue, error in the county court's computation of the surcharges listed in the final order. Ordinarily, we would not address an assigned error which lacks any discussion in the argument section of the brief. See *Pierce v. Landmark Mgmt. Group*, 293 Neb. 890, 880 N.W.2d 885 (2016) (an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court). However, because of this court's modification regarding the personal property tax, we must necessarily recalculate the total surcharge amount due from the cotrustees. Lou Ann asserts the court erred in determining the total surcharge amount was $73,675.88 when the sum of the itemized payments should have been $77,290.49. Lou Ann is correct that the total of the surcharges identified in the county court's order is not correct; however, the total asserted by Lou Ann is not correct either. Further, in light of this court's modification of the order to include the personal property tax, the new total surcharge amount is $79,257.49.

The trial court computed the surcharge for the items listed in its final order as follows:

There were . . . payments made by the [cotrustees] from the Trust assets for personal expenses and expenses that were not the responsibility of the Trust. Those payments were: $404.50 for the Umbrella Policy to Farmer's Mutual; $968.82 for the automobile policy to Farmer's Mutual, this reflects an $810.00 refund that was repaid to the trust; $767.67 for the [Farm-Guard] policy which is coverage of the property after it was transferred to the sub trusts; $780.63 to DISH Network which did not benefit the Trust; $1700 to Loup Valley [Rural] Public Power and Custer Public Power for electrical power to the house and feed yards; $841.30 for work done on remodeling the bathroom in [Henry's] house; $10,000 to Switzer Welding for the door installed on the building owned personally by [Roger]; $3812.96 for repairs to a pivot that pursuant to the lease agreement was the responsibility of the tenant; $24,400 for value of the trailers and vehicles that were transferred to Roseann; and $2,804.61 for real estate taxes that were paid on real estate owned personally by [Roger] and paid for out of trust assets. In addition the $30,000 loan made to Roseann prior to Henry's death which was not repaid should be paid back to the Trust. The total amount of damages caused by the [cotrustees'] breach of their duties is $73,675.88.

The total of the amounts set forth in the court's order is actually $76,480.49, which is more than the $73,675.88 arrived at by the county court, but less than the $77,290.49 asserted by Lou Ann in her brief. It appears Lou Ann added $810 to the correct sum of $76,480.49. However, the $810 was a credit for a refund made to the trust; it was not an additional surcharge. The correct total for the surcharge amounts listed in the order is $76,480.49; and, as a result of this court's modification related to the personal property tax ($2,777), the total amount to be repaid by the cotrustees is $79,257.49, and the county court's order is modified accordingly.

### 3. FAILURE TO REMOVE COTRUSTEES OF LOU ANN GODING SUBTRUST

Lou Ann argues that Roger and Roseann should be removed as cotrustees of the Lou Ann Goding Trust because they have not paid her any income even though she received Schedule K-1s showing income generated by the real estate held by her separate trust. She also asserts the cotrustees failed to follow the terms of Henry's Trust and failed to maintain the subtrusts. The cotrustees assert that any claim made by Lou Ann related to the subtrusts was not part of the proceeding. As to this issue, the county court's order specifically stated:

> The [cotrustees] have administered [Henry's] Trust and sub-trusts created by the Trust since [Henry's] death on December 23, 2010. The real estate that [Henry] had transferred to the Trust prior to his death was deeded by the [cotrustees] to the sub trusts on December 23 [sic], 2011. The administration of the sub trusts are not an issue properly before this Court.

However, as to the cotrustees fiduciary duties, the county court concluded the cotrustees breached their fiduciary duties by "failing to maintain the sub trusts created by the Trust as separate trusts and by failing to pay the income from the Trust to [Lou Ann]." The court found the breaches of fiduciary duties to be serious breaches and found it was "in the best interest of the trust administration to remove the [cotrustees]." The court's order addressed the cotrustees in their capacity as cotrustees of both the Trust and the subtrusts when discussing the breaches of fiduciary duties, as noted above, and accordingly, the court's removal of the cotrustees necessarily applied to Roseann and Roger as cotrustees of the Trust and the subtrusts. Although the county court was unwilling to consider evidence specific to the administration of the subtrusts, its conclusion that the cotrustees should be removed as cotrustees stemmed from breaches of their fiduciary duties to Henry's Trust and their responsibilities to the subtrusts.

Further, the plain language of Henry's trust does not distinguish between the trustee of the trust and the subtrusts. When referencing the subtrusts, the document says "[t]he trustee shall hold, administer, and distribute all of the trustee's right, title, and interest in and to the following described real property." There are no separate appointment procedures or processes related to the subtrusts. The county court's removal of Roseann and Roger as cotrustees and appointment of a successor trustee applied to Henry's Trust and Lou Ann's separate subtrust; accordingly, there is no error needing correction.

### 4. FAILURE TO AWARD AMOUNTS DUE TO LOU ANN UNDER TRUST

Lou Ann asserts the county court erred in failing to award her a portion of the Trust residue in a minimum amount of $100,243 and in failing to award trust income damages of $74,628. Lou

Ann claims she has not received any income from the Trust over the last five years and has only received a "trivial" amount of personal property from Henry's home. Brief for appellant at 23. She argues the K-1s show she is entitled to trust income but she has not received any, and the trustees have also failed to pay her any of the residue owed.

(a) Trust Residue

Lou Ann contends she is entitled to at least $100,243 in residue damages because this represents her one-third share of Henry's Trust residue. Lou Ann "totaled all of the assets that were collected by the Co-Personal Representatives and Co-Trustees, deducted the Trust's and Estate's expenses, and added the known assets that the Co-Trustees and Co-Personal representatives failed to collect. Lou Ann then divided the total by three to obtain her one-third interest in the residue." Brief for appellant at 24.

The assets Lou Ann claims the cotrustees failed to collect and which she challenges on appeal are: "$24,414 in corn from a guaranteed bushels agreement that Henry had with Mr. Smedra; $4,000 rent owed by Mr. Hruby for 2010 rent; $35,000 rent owed by Roseann for 2010; $59,808 of grain in the Rasmussen Bros. grain bank that was transferred to Roseann's grain bank; and an overpayment of $3,952.61 to Country Partners for calf feed." Brief for appellant at 24. The county court declined to find the challenged amounts as trust assets, noting only those items surcharged, as set forth previously. The court explained why it chose not to include certain items in the Trust, and, why an accounting was necessary, stating:

> The lack of accurate record keeping and co-mingling of assets makes it difficult to determine the amount of damages that have occurred due to the [cotrustees] breaches of their duties. Some of the transactions that [Lou Ann] has questioned were transactions made by [Henry] prior to his death. There has been no allegation that [Henry] was incompetent or unable to handle his own affairs prior to his death. There was evidence presented supporting that [Henry], himself, made some of the questioned transfers and transactions. The [cotrustees] do not have a duty to second guess the decisions and transactions that were made by [Henry], who was acting as trustee of the Trust prior to his death. There were, however, payments made by the [cotrustees] from the Trust assets for personal expenses and expenses that were not the responsibility of the Trust. . . .
>
> The [cotrustees] have argued that there are no assets left in the Trust and the Trust is ready to be closed. Although the real estate had been deeded to the sub trusts in 2011, the [cotrustees] have continued to deposit income from the real estate into the Trust account and have issued tax documents in the Trust's name. In addition, [Lou Ann] has not received any residue or income from the Trust as required under its terms. In order for [Lou Ann] to protect her interests as beneficiary and to be reasonably informed as to the administration of the trust, an accounting from the [cotrustees] is necessary.

There is competent evidence to support the county court's decision to not include the challenged assets as property of the Trust. There was evidence that: Henry agreed to transfer the bushels of corn from Thomas Smedra to Roseann; Lou Ann miscalculated the value of Dale Hruby's rent; the $35,000 check from Roseann to Henry was for tax planning, not rent; Henry

directed Rasmussen Brothers to transfer grain to Roseann; and the Country Partners payment was for a product ordered by Henry prior to his death. The details as to each follows.

Regarding the agreement between Henry and Smedra, Smedra testified he had an unwritten lease arrangement with Henry. Smedra prepared a note to himself reflecting the terms of that agreement, and it shows that Smedra's rent was 12,730.77 bushels of grain per year. In 2010, Smedra made two grain deliveries to Trotter Grain in the name of Henry's Trust and Eleanor's Trust. These two deliveries totaled 8,408 bushels of grain, which was 4,322.77 bushels short of the yearly rent. Lou Ann said the value of these missing bushels was $20,000 to $24,000. Smedra testified he delivered the remaining bushels of corn to Litchfield, Nebraska, and "Hank specifically requested to put this in Rosie's name." This evidence supports the county court's decision to exclude this transaction as a trust asset since the transfer to Roseann was directed by Henry prior to his death.

As to the rent Lou Ann claims is owed to the trust from Dale Hruby, Lou Ann testified she had personal knowledge of $8,000 in 2010 rent that Hruby owed or paid to Henry. Lou Ann stated that "on the tax return, Exhibit 81 on Schedule E, the amount picked up for rents received is greater by $4,000 than the actual amount that went into the checking account during 2010 for my dad's checking account." She went on to say that Hruby paid "typically, $8,000 of rent to my dad, that was his arrangement. However, he paid the last portion in the last week of the year, typically. That amount was included on the tax return but was never deposited into the checking account." Lou Ann believes that, because Hruby paid rent in two installments every year, there is a $4,000 deposit missing from the end of 2010.

Roseann disputed the $8,000 rental value. She testified that Hruby rented "some crop ground and he also rented a little pasture that he used for his horses and he rented a house." She argued the rent was $4,000 for the crop ground, not $8,000 as Lou Ann claimed. Roseann said Hruby also paid $1,500 for the pasture, $1,800 for the house, and the remaining $700 "came from Guy Mills off of the bin that I owned that dad took the rent." Roseann's testimony clarified there was not another $4,000 in rent due from Hruby as alleged by Lou Ann; it was not error for the county court to rely on such evidence.

Lou Ann also claimed Roseann owed the Trust $35,000 in rent from 2010. In particular, Lou Ann testified she

> went back through the 2009 tax return and looked at Schedule E, as well the 2008 tax return, and looked at Schedule E and noted the rent collected from each year in 2008, 2009. And in 2010, the difference is roughly 35,000 less rent collected in 2010 at the end of the year, post my father's death, than it had been in '08 and '09.

Lou Ann testified there was a deposit slip for 2009 for a $35,000 payment, which Lou Ann claimed "ties back to rent" in the 2009 tax return. She therefore suggests a similar amount should have been collected for 2010, but was not. When Roseann was asked if she owed rent to Henry for 2010 in the amount of $35,000, she said no. Roseann explained the 2009 deposit from herself to Henry as follows:

> Um, I'm not sure if it was really for rent. It's called tax planning at the end of the year. When dad and I would go and talk to the accountant and apparently - and, especially, after mom died, he got to re-depreciate like half of all mom's machinery and everything. So he

- 14 -

got a big tax break, he could handle more income. And I apparently could - that would not push him into another tax bracket. But it helped me to have some more expense. So he says write me a check and we'll call it whatever. I don't remember what he called it.

Roseann repeated that the $35,000 was not an annual rent paid, and confirmed it was a one-time payment made for tax purposes. It was not error for the county court to deny Lou Ann's claim that another $35,000 rent payment was owed to Henry's Trust.

Lou Ann also sought to include $59,808 for dry corn stored at the Rasmussen Brothers feedlot. She claims the last head of cattle was sold on September 1, 2010, and there was a balance of 606,000 pounds of feed still there. Lou Ann testified the remaining corn in the grain bank was transferred to Roseann and there was "no corresponding deposit in my dad's checking account to reflect that he received payment for the grain that was transferred." Lou Ann said that based on pricing at Trotter Grain Elevator at that time, the value of the corn would have been approximately $60,000. Lou Ann argues this amount belonged in Henry's Trust and should have been reflected in the residue of the trust.

Gary Rasmussen runs a cattle feeding operation, Rasmussen Land and Cattle Incorporated. Rasmussen testified Henry would bring corn to use to feed his cattle. As the year progresses, Rasmussen deducts whatever is fed to the cattle from the grain bank. Rasmussen said in May 2010 corn was transferred from Henry's grain bank to Roseann's grain bank. Rasmussen confirmed that only the holder of the grain bank account can transfer from one grain bank to another. Rasmussen confirmed another transfer was made from Henry's account to Roseann's grain bank on December 9, 2010, and that such a transfer would have only been done upon Henry's request. Roseann said, "I spoke with [Henry] in December when he transferred the corn into my name because I had paid many other bills that he didn't reimburse me for. He just called it - we called it a wash. We just let it go." There was competent evidence to support the county court's decision to not include the value of this grain in Henry's Trust since there was evidence showing Henry transferred this asset to Roseann before his death.

The final item challenged by Lou Ann as being erroneously excluded as an asset of Henry's Trust is a $3,952.66 payment for calf feed. On December 4, 2010, Roseann wrote a check in this amount on Henry's account to Country Partners. Lou Ann argues this expense could not have been permissible because Henry did not own cattle at this time. Roseann testified this was for a liquid supplement Henry had ordered back in September 2010 that was billed at the end of the year. She claimed Henry "needed more feed expense because he had sold a lot of cattle that year." Roseann explained that even though Henry had sold his cattle by that time, he paid the bill anyway for tax planning purposes. Again, this was a decision attributed to Henry prior to his death, and we find no error in the county court's decision to not restore the value of the liquid supplement to Henry's Trust.

### (b) Trust Income

Lou Ann argues "[t]he total income Lou Ann should have received for December 23, 2010 through December 21, 2014 is $74,628." Brief for appellant at 25. This amount is derived from Lou Ann's calculations for "the three parcels of real estate which generate the income to which Lou Ann is entitled." *Id.* Although it does appear Lou Ann is entitled to some income from Henry's

Trust, as well as her subtrust, we cannot address this issue since there has been no final determination as to what amount Lou Ann may be entitled to for income under the Trust. And to the extent these sums also represent amounts Lou Ann claims could have been generated by her subtrust (for 2012 and subsequent years), the county court correctly concluded the subtrusts were not parties to the pending action and therefore, "[t]he administration of the sub trusts are not an issue properly before this Court." However, the county court did find that the cotrustees: continued to deposit income from the real estate into Henry's Trust; have issued tax documents in the Trust's name; have failed to maintain separate subtrusts as directed by Henry's Trust; and have failed to pay income to Lou Ann. The court determined Lou Ann had not received any residue or income from the Trust as required under its terms, and therefore, in order to protect her interest as a beneficiary, the county court ordered an accounting.

Although we find no error in the county court's decision to exclude the challenged assets from Henry's Trust as discussed above, no determination can be made as to Lou Ann's proper share of the residue or income from Henry's Trust until the ordered accounting has been completed.

### 5. EXCLUDED TESTIMONY AND EXHIBITS

Although Lou Ann assigns the county court erred by excluding certain testimony and exhibits relating to Trust operations and reasonable rental rates for certain real property after 2011, there is no separate heading in the argument section of her brief addressing these alleged errors. We did find, however, in the section discussing her entitlement to income from the Trust, a paragraph which states, in relevant part, "Throughout the trial, the trial court excluded evidence and testimony regarding the operation of the Trust during the years 2012, 2013, 2014, and 2015, including, but not limited to, the testimony of Mr. Woodward." Brief for appellant at 25. She generally asserts "[t]he court erred in sustaining the objections to relevance and excluding the evidence and testimony," and "[i]t is clear from the evidence and testimony that Henry's Trust continued to operate through the present. Schedule K-1s continued to be issued in the name of Henry's Trust through 2014." *Id*. Therefore, Lou Ann argues the proffered evidence regarding the Trust's operations for 2012 through 2015 was "relevant and the court erred in sustaining the objections." *Id*.

We first observe that a general assignment that the court erroneously overruled objections without supporting argument as to why the rulings were erroneous or how they resulted in prejudice, is insufficient to preserve the issue for appellate review. See *Pierce v. Landmark Mgmt. Group*, 293 Neb. 890, 880 N.W.2d 885 (2016). Lou Ann directs us only to "the testimony of Mr. Woodward" and refers to the Schedule K-1s (exhibit 102), which exhibit was received. Therefore, we limit our review of excluded evidence to "the testimony of Mr. Woodward" contained in the pages parenthetically identified in Lou Ann's brief.

Bart Woodward, co-owner of Agri Affiliates, is a farm manager, farm real estate appraiser, and real estate broker. He conducted a "drive-by rental analysis" on three properties; his legal descriptions correlate with three properties (grandma's farm, west pivot, and east pivot) from which Lou Ann claimed entitlement to rental income as reflected in her exhibit 98, which was received as a demonstrative exhibit. Woodward attempted to testify as to the potential rental income from those three properties, but there was an objection as to any values for 2012 and later

being irrelevant. Since Henry's Trust no longer owned the three properties after 2011 (all real estate was transferred to the subtrusts on December 30, 2011), and Henry's Trust was the only relevant party to the pending action, the county court sustained the objection as to any evidence of such values for 2012 and subsequent years. Woodward's testimony and report was admitted as to the 2011 rental values, which he determined to be $21,755 (grandma's farm), $32,740 (west pivot), and $32,439 (east pivot).

The gist of Lou Ann's argument goes to whether the county court could reach any decision with regard to amounts owed to Lou Ann either as a beneficiary of Henry's Trust or her subtrust. As just discussed in the previous section, no determination can be made as to Lou Ann's proper share of the residue or income of Henry's Trust until the accounting ordered by the county court has been completed. We cannot say the court abused its discretion in excluding evidence that was not relevant to deciding amounts due to Lou Ann under Henry's Trust. See *Gallner v. Larson*, 291 Neb. 205, 865 N.W.2d 95 (2015) (a trial court has the discretion to determine the relevancy and admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of discretion).

### 6. INSUFFICIENT AWARD FOR ATTORNEY FEES AND COSTS

Lou Ann argues the county court's attorney fee award of $20,000 was an abuse of discretion because the cotrustees failed to keep her adequately informed of Trust operations and she had no choice but to resort to litigation. "Further, because of the [cotrustees] deliberate refusal to provide such information and the complexity of the issues present, Lou Ann's attorneys were forced to pursue extensive discovery." Brief for appellant at 27. That discovery included multiple depositions, multiple sets of discovery requests, subpoenas for documents from third parties, hiring expert witnesses to review documents and testify at trial, and two full days of trial. Lou Ann requested $189,000 in attorney's fees (reduced from $220,037.75), plus $24,291.19 in costs. The cotrustees suggest "[t]here was no evidence presented this was a novel or difficult case. The trial court recognized the amount submitted by [Lou Ann] was excessive and included many duplications of effort." Brief for appellee at 21-22.

The Nebraska Uniform Trust Code explicitly provides when attorney fees are appropriate in trust administration cases. *In re Rolf H. Brennemann Testamentary Trust*, 288 Neb. 389, 849 N.W.2d 458 (2014). In a judicial proceeding involving the administration of a trust, the court, as justice and equity may require, may award costs and expenses, including reasonable attorney's fees, to any party, to be paid by another party or from the trust that is the subject of the controversy. Neb. Rev. Stat. § 30-3893 (Reissue 2016).

A trial court's decision awarding or denying attorney fees will be upheld on appeal absent an abuse of discretion. *In re Conservatorship of Abbott*, 295 Neb. 510, 890 N.W.2d 469 (2017).

To determine proper and reasonable fees, it is necessary for the court to consider the nature of the proceeding, the time and labor required, the novelty and difficulty of the questions raised, the skill required to properly conduct the case, the responsibility assumed, the care and diligence exhibited, the result of the suit, the character and standing of the attorney, and the customary charges of the bar for similar services. *In re Guardianship & Conservatorship of Donley*, 262 Neb. 282, 631 N.W.2d 839 (2001).

In *In re Conservatorship of Abbott*, *supra*, beneficiaries of a trust succeeded in removing a trustee for failing to administer a trust in good faith and failing his duty to inform and report, and for violating his duty of loyalty and impartiality. The beneficiaries requested $139,743.25 in attorney fees and $6,112.76 in costs for the trust proceeding. The county court awarded $44,957.98 in attorney fees and $1,645.48 in costs. The Supreme Court found no abuse of discretion by the county court in its award even though the county court's reasoning for reducing the award of attorney fees in the trust proceeding "was not explicit." *Id*. at 529, 890 N.W.2d at 484.

As noted above, there are many variables a trial court may consider when determining an award of attorney fees, and even a significantly lower award than the attorney fees requested will not constitute an abuse of discretion. We agree with the cotrustees that the county court was in the best position to determine what attorney fees were warranted; accordingly, we find no abuse of discretion by the county court in its attorney fee award of $20,000.

### 7. SUCCESSOR TRUSTEE FEE SPLITTING

After ordering the removal of the cotrustees and appointing a successor trustee, the county court ordered that the fees for the successor trustee would be paid out of the assets of the Trust, and if there were insufficient assets in the Trust to cover the successor trustee's fee, each of the beneficiaries "shall pay 1/3 of the fee." We reproduce Lou Ann's argument on this point in its entirety (excluding only the page citation to the court's order in the transcript):

> While the trial court correctly removed the [cotrustees] as trustees of the Trust and appointed the Successor Trustee, the court erred in requiring the beneficiaries to pay trustee fees if the trust has insufficient funds to pay the Successor Trustee's fee. As a general rule, a beneficiary is not personally liable to the trust for matters connected with trust administration. Restatement (Third) of Trusts § 104 (2012).

Lou Ann provides only a general reference to the Restatement (Third) of Trusts, without any specific discussion of how that legal principle should apply to the county court's order assessing the successor trustee's fee equally between the siblings in the event Henry's Trust had insufficient assets. A claimed prejudicial error must not only be assigned, but must also be discussed in the brief of the asserting party, and an appellate court will not consider assignments of error which are not discussed in the brief. *Hass v. Neth*, 265 Neb. 321, 657 N.W.2d 11 (2003).

Although we need not consider this assigned error, we nevertheless reiterate the court's statutory authority to order costs and expenses in trust proceedings. "In a judicial proceeding involving the administration of a trust, the court, as justice and equity may require, may award costs and expenses, including reasonable attorney's fees, to any party, *to be paid by another party* or from the trust that is the subject of the controversy." § 30-3893 (emphasis supplied). Additionally, we note that Restatement (Third) of Trusts § 104, upon which Lou Ann relied, addresses a beneficiary not being personally liable to the trust, with some exceptions. Section 104 does not address payment of costs to a successor trustee. We fail to see how § 104 supports Lou Ann's assigned error.

Lou Ann's remaining errors pertain to Henry's estate proceeding. Henry's will nominated Roseann and Roger as copersonal representatives of Henry's estate upon his death. Lou Ann contends Roseann and Roger breached their fiduciary duties as copersonal representatives and should have been removed as copersonal representatives of Henry's estate because they failed to: keep her informed about the estate, impartially administer the estate, collect estate assets, file an accurate inventory, and provide an accounting. Lou Ann also asserts the county court erred by not assessing a surcharge and by overruling Lou Ann's objection to the inventory.

A person interested in the estate may petition for removal of a personal representative for cause at any time. Neb. Rev. Stat. § 30-2454(a) (Reissue 2016). Section 30-2454(b) provides:

> Cause for removal exists when removal would be in the best interests of the estate, or if it is shown that a personal representative . . . has disregarded an order of the court, has become incapable of discharging the duties of his office, or has mismanaged the estate or failed to perform any duty pertaining to the office.

The county court declined to remove the copersonal representatives because, under Henry's will, "any residue of [Henry's] Estate pours over into the trust. The Trust is, therefore, the only beneficiary of [Henry's] Estate. [Lou Ann's] claims of property that are unaccounted for and damages are claims for the Trust Administration and not the Estate proceeding." The county court denied Lou Ann's petition to remove the copersonal representatives (and for an accounting and surcharge), as well as overruled her objection to the estate's inventory. The copersonal representatives were ordered to file a final accounting, a schedule of distribution, and a formal petition for complete settlement of the estate, within 30 days. The court also stated, "Any other claim for relief not specifically addressed in this order is also denied."

Notably, Article Third of Henry's will devised all his personal and household effects to the Trust. Article Fourth of his will states, "All the residue of my estate I devise to the trustee of the Trust to be added to the Trust and administered as part of and pursuant to all the terms and conditions thereof."

Also, Henry's Trust had an assignment schedule which transferred "[a]ll my interest in personal household furniture and furnishings, wearing apparel, collectibles and antiques, personal effects and other articles, tools, and equipment or personal or household or yard use or ornament which I presently own or may hereafter acquire" to his Trust.

According to the lawyer who drafted Henry's will and trust documents, Henry's will was known as a pour-over will. The idea or "the hope" is that you would not use the will to settle a person's estate. According to the lawyer, "[I]t's a backup document that in case you didn't get all the assets into the trust or identified with the trust at the time of death, it would pour those assets - that's where the terminology comes from - but it would pour those assets into the trust to be distributed under the terms of the trust." The result of the will would be to send everything to the trust. In Henry's case, assets were discovered which were not identified with the trust or did not have a beneficiary or were not payable upon death to the trust. The lawyer explained, "And so the beneficiary of the will, under the will, became the trust and so we did have to file the will and start a probate in order to get those assets from the financial institution into the trust." The lawyer

stated Henry's will does name the Trust as the sole beneficiary and the sole heir of the estate. The lawyer indicated the inventory was filed with the county court on December 28, 2011, and the inheritance tax was finished and the receipt filed all "about that same date, right at the end of December." According to the attorney, the estate had not been closed because of the pending litigation; there was no other reason to not close it, to his knowledge.

Many of the alleged missing assets discussed in Lou Ann's brief in support of her argument that the copersonal representatives should have been removed and surcharged (or in support of her objection to the inventory) are largely the same arguments we addressed earlier with regard to her claims of missing or unidentified trust assets. For example, Lou Ann again discusses in her brief: Smedra delivering grain to Litchfield and putting it in Roseann's name; the failure to collect $4,000 in rent from Hruby; the failure to collect $35,000 in rent from Roseann; the balance of grain at Rasmussen Brothers transferred to Roseann's grain bank; the payment for calf feed delivered when Henry no longer owned cattle; and the $30,000 loan to Roseann. We addressed those matters previously, so they need not be addressed again here.

However, Lou Ann also claims the copersonal representatives failed to investigate and/or acquire additional alleged missing items which should have been included in the estate's inventory, namely: the proceeds from the sale of the cattle maintained in Lot 459 at Rasmussen Brothers in 2010; an investigation into what happened to the assets which generated $3,000 in interest income as reflected on Henry's 2008 personal tax return, but was not reflected in subsequent tax years; an investigation into why Henry's rental income in 2010 "dropped sharply from 2008 and 2009." Brief for appellant at 40.

As to the Lot 459 cattle, Lou Ann asserts Henry never received any compensation for the cattle held in Lot 459, and the copersonal representatives failed to produce a check or account for this asset. However, at trial, Rasmussen testified that the cattle held in Lot 458 were owned by Henry, and those in Lot 459 were owned by Roseann. The documentation reflected they came from Henry's ranch, since, according to Rasmussen, "they were all raised there." Exhibit 88 is a Rasmussen Brothers document showing "Roseann Wilson (100%)" for 89 head of cattle, all attributed to Lot 459. It was reasonable to conclude this was not a missing asset belonging to Henry or his Trust.

Regarding Henry earning less interest income after 2008, Lou Ann asserts the copersonal representatives should have investigated "what became of assets that generated more than $3,000 of interest income on Henry's 2008 personal tax return, but for which there was no interest income in subsequent years' tax returns." Brief for appellant at 39. Sandi Bentley, a certified public accountant, testified she had been the accountant for Henry and Eleanor, and also served as the accountant for Roseann, the Trust, and the estate. Bentley explained that a change in the interest income reflected on tax returns could be from a change in interest rates, or "it could be that Henry had withdrawn funds to pay for separate items." Bentley acknowledged the depreciation schedules reflected purchases of: two equipment purchases for $15,000 each in March 2008, and a $25,000 windrower and a $72,300 backhoe excavator in September 2008. She agreed that purchases of major pieces of equipment "account for depleting your savings[.]" These were reasonable explanations for the change in Henry's reported interest income; further, any withdrawals or liquidation of assets made by Henry during his lifetime are not particularly relevant in the present matter since no allegations were made that Henry was incompetent to make such decisions.

As to the reduction in the rental income earned by Henry in 2010, this has already been addressed. Lou Ann testified the difference between the 2009 and 2010 rent was $34,926, which she related to rent she claimed was due from Roseann. This was based on a $35,000 payment Roseann made to Henry in 2009. Roseann confirmed making that payment, but explained it was not an annual rent payment; rather, it was a one-time payment made for tax purposes. Bentley testified that Henry and Roseann would come in together for year-end tax planning, "and we would calculate where their tax would be through the date that they came in." They would decide whether they wanted to pay that amount of tax or pay more expenses, and would discuss between themselves what expenses would be paid. Bentley said, "For example, Henry might say, well, I'll pay the feed bill and, Rosie, you pay the repair bill or -- and that type of thing." There was a reasonable explanation for the additional $35,000 characterized as rent in 2009, which according to Roseann was a one-time payment for tax purposes. There was no other evidence to indicate a further investigation was warranted on this claim.

In reviewing a judgment of the probate court in a law action, we do not reweigh evidence, but consider the evidence in the light most favorable to the successful party. *In re Estate of Hedke*, 278 Neb. 727, 775 N.W.2d 13 (2009). And we resolve evidentiary conflicts in favor of the successful party, who is entitled to every reasonable inference deducible from the evidence. *Id*. The probate court's factual findings have the effect of a verdict, and we will not set those findings aside unless they are clearly erroneous. *Id*.

The county court's decision to not remove or surcharge the copersonal representatives and to overrule the objection to the inventory is supported by competent evidence and is not clearly erroneous. According to the estate's attorney, there was no reason to not close the estate; it was only opened to move some "assets from the financial institution into the trust." Since Henry's personal property and the residue of his estate were transferred to Henry's Trust by the terms of his will, it was not error for the county court to conclude Lou Ann's claims regarding any unaccounted for property or other damages were claims Lou Ann could (and did) raise under the Trust's administration, rather than the estate proceeding.

## VII. CONCLUSION

In the trust case, A-15-1014, the county court erred in its calculation of the total surcharges and in failing to surcharge the cotrustees for the 2011 personal property tax ($2,777), and we therefore modify the court's order to reflect a total surcharge amount of $79,257.49. The county court's order in A-15-1014 is affirmed in all other respects. In the estate case, A-15-1015, the county court's order is affirmed.

JUDGMENT IN NO. A-15-1014 AFFIRMED AS MODIFIED.
JUDGMENT IN NO. A-15-1015 AFFIRMED.

RIEDMANN, Judge, concurring in part, and in part dissenting.

I dissent from that portion of the majority's opinion that modifies the county court's order to surcharge the cotrustees for the 2011 property tax. Based upon my review, the evidence does not support a finding that Roseann owned or held the personal property in question as of January 1, 2011 and, thus, was not subject to payment of personal property taxes for that property.

As correctly pointed out by the majority, Roseann was instructed to pay the property tax from Howard's trust if it was the owner of the property on January 1, 2011. This advice conformed to the directions on the Nebraska Personal Property Return and Neb. Rev. Stat. § 77-1201 (Reissue 2009). Section 77-1201 requires:

> A complete list of all taxable tangible personal property held or owned on the assessment date [January 1] shall be made as follows: (1) Every person shall list all his or her taxable tangible personal property as defined in section 77-105 having tax situs in the State of Nebraska; . . . (4) The taxable tangible personal property of a person for whose benefit it is held in trust, by the trustee, and of the estate of a deceased person, by the personal representative or administrator.

The evidence reveals that Howard died on December 23, 2010. His Trust provided that if Roseann survived him and his wife, "the trustee shall distribute all of the trustee's right, title and interest" to the subject property to Roseann. While Roseann testified that she "eventually" received the property, there is no evidence to support a determination that the trustee had "distributed" the "right, title and interest" to the property as of January 1, 2011, the operative date for assessment of taxes. To the contrary, Roseann testified that as of that date, she and her brother had yet to meet with an attorney and "nothing had been distributed yet."

The majority likens the situation to that of a conditional sales contract, citing *Landis Machine Co. v. Omaha Merchants Transfer Co.*, 142 Neb. 397, 9 N.W.2d 198 (1943). It derives from that case that "the personal property belonged to the vendee, along with the personal property taxes incident to that ownership, in light of the vendee's use and enjoyment as the general beneficial owner, whereas the interest of the vendor was one of title for security of payment only and not absolute ownership."

The issue in *Landis Machine Co. v. Omaha Merchants Transfer Co., supra*, however, was whether equipment subject to a conditional sales contract and in the possession of the vendee, was property of the vendee, such that the treasurer could sell it to collect delinquent property taxes. This has little relevance, if any, to the issue of whether the beneficiary of a trust is required to pay personal property tax on property that has not been distributed to her by January 1 of the tax year.

Absent evidence that Roseann "held or owned" the subject property on January 1, 2011, I would not modify the county court's order to add a surcharge for personal property tax. As to the remainder of the majority's opinion, I concur.